IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CV-662-D

| | |
|---|---|
| POLYZEN, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| RADIADYNE, LLC, ) | |
| ) | |
| Defendant. ) | |

On November 21, 2011, Polyzen, Inc. ("Polyzen" or "defendant"), filed suit in this court against RadiaDyne, LLC ("RadiaDyne"), alleging patent infringement [D.E. 1]. On December 13, 2011, RadiaDyne filed a motion to dismiss for lack of jurisdiction and to correct ownership of the patent-in-suit [D.E. 10]. On December 23, 2011, RadiaDyne sued Polyzen in the United States District Court for the Southern District of Texas, alleging breach of contract and other claims. See Complaint at 9–13, RadiaDyne LLC v. Polyzen, Inc., No. 5:12-CV-102-D (E.D.N.C. Dec. 23, 2011), [D.E. 1]. On February 24, 2012, the Southern District of Texas transferred RadiaDyne's case to this court. See Order, RadiaDyne LLC v. Polyzen, Inc., No. 5:12-CV-102-D (E.D.N.C. Feb. 24, 2012), [D.E. 10]. On July 2, 2012, the court consolidated the two cases [D.E. 26]. On September 13, 2012, the court denied RadiaDyne's motion to dismiss for lack of jurisdiction and to correct ownership [D.E. 30].

On June 4, 2013, RadiaDyne moved for partial summary judgment on inventorship [D.E. 65]. On June 28, 2013, Polyzen filed a motion for summary judgment on inventorship [D.E. 72]. On October 31, 2013, the court denied both motions for summary judgment on inventorship [D.E. 88].

On November 4, 2013, Polyzen filed an amended complaint, alleging patent infringement, breach of contract, and misappropriation of trade secrets [D.E. 89]. On November 18, 2013, RadiaDyne answered and added an additional counterclaim of bad faith trade secret litigation [D.E. 91]. On December 19, 2013, Polyzen answered [D.E. 97].

On May 23, 2014, both parties filed multiple motions for summary judgment. Polyzen moved for summary judgment on the validity of the patent-in-suit [D.E. 107] and on its patent infringement claim [D.E. 116]. RadiaDyne moved for partial summary judgment on Polyzen's trade secret misappropriation claim [D.E. 108] and on its own breach of contract counterclaim [D.E. 112]. On December 12, 2014, the court denied Polyzen's motion for summary judgment on the validity of its patent [D.E. 141]. As explained below, the court grants RadiaDyne's motion for partial summary judgment on its breach of contract counterclaim and grants in part RadiaDyne's motion for partial summary judgment on Polyzen's trade secret misappropriation claim.

I.

In early 2007, John Isham, founder and president of RadiaDyne, learned of Polyzen when searching the Internet for "medical balloons" and "medical devices." Isham Dep. [D.E. 109-2] 106. Isham then contacted Polyzen. Id. On February 12, 2007, RadiaDyne and Polyzen began working together to develop a medical balloon device design and the technology and process necessary to produce it. See Development & Commercialization Agreement ("2008 DCA") [D.E. 109-16] ¶ 3.d. On March 26, 2007, Rubin Shah, a Polyzen employee, sent Isham a quote for a project to "Design & Thermoform/ RF Weld PU Balloon – Phase I." See [D.E. 109-3] 3–4. The quote totaled $23,500, and it included a price of $4,500 for "design" and a price of $19,000 for prototype production. Id. Tilak Shah, Polyzen's founder, created the quote. Id. 4; Tilak Shah 30(b)(6) Dep. [D.E. 132-1] 24, Feb. 26, 2014. On March 28, 2007, RadiaDyne issued a purchase order to Polyzen for a total of

2

$23,500. See [D.E. 109-4] RD 1132. On March 29, 2007, Polyzen sent RadiaDyne its first invoice and RadiaDyne paid a deposit of $4,500. See [D.E. 109-5] RD 1131; [D.E. 109-6] RD 1136.

On July 27, 2007, Polyzen sent a balloon design to Isham, which he approved. See [D.E. 109-7] P 219. On July 31, 2007, Isham sent Rubin Shah an email and told Shah that he wanted to launch the product at the October 2007 ASTRO trade show. See [D.E. 109-8] RD 2649. Rubin Shah responded the same day and told Isham that he could meet the deadline despite it being "a very aggressive timeline." Id. Isham replied later in the day and asked for information on the manufacturing process so he could "submit [a] FDA Registration letter." Id.

On September 25, 2007, Polyzen filed a provisional patent application. See Tilak Shah 30(b)(6) Dep. 192. Polyzen did not inform RadiaDyne of the patent application. Cf. id. 192–92; Tilak Shah Dep. [D.E. 113-11] 89–90, Mar. 15, 2013. Polyzen intended to get the patent application filed before the balloon was publicly displayed at the October 2007 ASTRO trade show. See Tilak Shah 30(b)(6) Dep. 228.

On September 26, 2007, Tilak Shah sent Isham quotes for two new phases: Phase II, which consisted of the production of 100 samples "for testing and trials," and Phase III, which consisted of full-scale production of the medical balloons. See [D.E. 109-9] 2–7. RadiaDyne completed purchase orders for both phases. See [D.E. 109-10, 109-11].

On October 9, 2007, Polyzen and RadiaDyne entered into a "Development and Commercialization Agreement" that assigned different rights and obligations to the two parties. See 2007 DCA [D.E. 122-3]. On February 8, 2008, the parties entered into a new and almost identical agreement. See 2008 DCA 2. Polyzen drafted the 2008 DCA with the assistance of Willy Manfroy, an intellectual property licensing specialist. See Tilak Shah 30(b)(6) Dep. 191, 262–64. In the 2008 DCA, "the parties agree[d] that RADIADYNE TECHNOLOGY and RADIADYNE PRODUCT will

3

remain the properties of RADIADYNE and POLYZEN TECHNOLOGY, DEVICE PROCESS TECHNOLOGY and BALLOON PROCESS TECHNOLOGY will remain the property of POLYZEN." 2008 DCA ¶ 6.a. The 2008 DCA defines "RadiaDyne Product" as "[s]pecific design of rectal balloon catheter for locating/supporting prostate during radiation therapy with Polyzen's Balloon Process Technology." Id. ¶ 2.e (emphasis omitted). The 2008 DCA defines Polyzen's Balloon Process Technology as "Polyzen's PU film welded balloon technology, including film formulation, thickness and multi-layer film welded, designed to articulate desired shape and profile of balloons for various applications." Id. ¶ 2.d. The definition and assignment of intellectual property survive any termination of the 2008 DCA. Id. ¶ 7.b.

On March 12, 2008, Isham forwarded to Dielectrics, Inc. ("Dialectrics"), another manufacturer, the "product specification drawings" for the balloon, which Polyzen had previously sent to Isham. See [D.E. 109-17] DIE 117–19.

On September 25, 2008, Polyzen filed another patent application for a "Multi-Layer Film Welded Articulated Balloon." See '497 Patent [D.E. 1-3] 2.

On September 10, 2009, Isham forwarded to Dielectrics another email from Polyzen, which contained an attachment with an updated balloon design. See [D.E. 109-20] DIE 278–79. In November 2009, RadiaDyne terminated the 2008 DCA with Polyzen. See Def.'s Answer Am. Compl. [D.E. 91] ¶ 43.

On July 12, 2011, the United States Patent & Trademark Office ("PTO") issued Patent No. 7,976,497 ("the '497 patent"). See '497 Patent 2. The '497 patent listed Tilak Shah and Christopher Strom as inventors and Polyzen as the assignee. Id. The '497 patent issued with five claims, all directed to "a medical balloon device." Id. 10.

4

II.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment must initially show an absence of genuine dispute of material facts or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If a moving party meets its burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law properly preclude summary judgment. Anderson, 477 U.S. at 248. In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. Matsushita, 475 U.S. at 587–88.

A.

The court first addresses RadiaDyne's motion for summary judgment on its breach of contract counterclaim. In the contract, the parties agreed to apply North Carolina law. See 2008 DCA ¶ 8.a. Under North Carolina law, a party alleging breach of contract must prove the existence of a valid contract and breach of the contract's terms. See McLamb v. T.P. Inc., 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005), disc. rev. denied, 360 N.C. 290, 627 S.E.2d 621 (2006); Poor v.

5

Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000); Jackson v. Carolina Hardwood Co., 120 N.C. App. 870, 871, 463 S.E.2d 571, 572 (1995). The parties do not dispute the validity of the 2008 DCA. Rather, they dispute whether Polyzen breached the 2008 DCA.

In interpreting the 2008 DCA, the court "examine[s] the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Philip Morris USA Inc., 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005); Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." Phillip Morris USA, 251 N.C. at 773, 618 S.E.2d at 225 (quotation omitted). "Intent is derived not from a particular contractual term but from the contract as a whole." Id., 618 S.E.2d at 225; see Briggs, 251 N.C. at 644, 111 S.E.2d at 843 ("To ascertain this intent, the court looks to the language used, the situation of the parties, and objects to be accomplished."); Jones v. Casstevens, 222 N.C. 411, 413–14, 23 S.E.2d 303, 305 (1942). If there is an ambiguity, the court construes the ambiguity against the party who drafted the contract. Chavis v. S. Life Ins. Co., 318 N.C. 259, 262, 347 S.E.2d 425, 427 (1986); Cowell v. Gaston Cnty., 190 N.C. App. 743, 746, 660 S.E.2d 915, 918 (2008). A court may interpret a contract as a matter of law if the dispositive contractual language is unambiguous or if extrinsic evidence in the record is dispositive of the interpretive issue. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992).

RadiaDyne argues that Polyzen breached the 2008 DCA because (1) Polyzen's act of filing for and receiving the '497 patent constituted an act of ownership over the design of the medical balloon device; and (2) the 2008 DCA gave ownership of the design of the medical balloon device to RadiaDyne and not to Polyzen. See Def.'s Mem. Supp. Mot. Partial Summ. J. Breach of Contract [D.E. 113] 1, 6–11. The court addresses each argument in turn.

6

First, the act of filing a patent does not, in and of itself, exert ownership of the claimed invention. Federal law requires that the patent list only and all of the true inventors—misjoinder or nonjoinder voids the patent. See, e.g., 35 U.S.C. §§ 111(a), 115(b)(2); Iowa State Univ. Research Found., Inc. v. Sperry Rand Corp., 444 F.2d 406, 408–10 (4th Cir. 1971) (noting that a patent is void if it lists more or less than all the true inventors). Polyzen's application for the '497 patent does not necessarily conflict with RadiaDyne's potential ownership interest in the patent. Rather, the relevant question is the identity of the assignee of the title and rights to the '497 patent. See, e.g., Levin v. Septodont, Inc., 34 F. App'x 65, 67 (4th Cir. 2002) (unpublished) (noting that the assignee is "the record owner" of the patent); Minco, Inc. v. Combustion Eng'g, Inc., 95 F.3d 1109, 1116 (Fed. Cir. 1996) ("An assignment of patent rights operates to transfer title to the patent[.]"); Diamond Int'l Corp. v. Md. Fresh Eggs, Inc., 523 F.2d 113, 114 (4th Cir. 1975) (noting that the assignee is the owner of a patent); Am. Monorail Co. v. Parks-Cramer Co., 245 F.2d 739, 739 (4th Cir. 1957) (same).

Polyzen is the sole assignee of the '497 patent. See '497 Patent 2. Thus, Polyzen owns the '497 patent and the claims made therein for a medical balloon device.

Next, the court considers whether Polyzen's ownership of the '497 patent constitutes a breach of the 2008 DCA. The 2008 DCA assigns to RadiaDyne the so-called "RadiaDyne Product," or the "[s]pecific design of rectal balloon catheter for locating/supporting prostate during radiation therapy with Polyzen's Balloon Process Technology." 2008 DCA ¶¶ 2.e, 6.a (original emphasis omitted and emphasis added). "Design" means, among other definitions, "a preliminary sketch or outline . . . showing the main features of something to be executed," or "the drawing up of specifications as to structure, forms, positions, materials . . . in the form of a layout for setting up, building, or fabrication." Webster's Third New International Dictionary 611–12 (1993). The

7

Balloon Process Technology, which paragraph 2.e of the 2008 DCA expressly incorporates into the RadiaDyne Product, includes "Polyzen's PU film welded balloon technology . . . designed to articulate desired shape and profile of balloons for various applications." Id. ¶ 2.d. The 2008 DCA assigns to Polyzen the Device Process Technology, which "[m]eans the device design development, fabrication processes, material specifications, testing procedures and documentation developed by Polyzen to manufacture specific product for RadiaDyne . . . ." Id. ¶¶ 2.c, 6.a.[1]

Here, the dispute turns on whether the claims of the '497 patent are directed to the specific design of the medical balloon, incorporating Polyzen's Balloon Process Technology, or to the Device Process Technology that includes "device design development, fabrication processes, [and] material specifications." See, e.g., Markman v. Westview Instruments, Inc., 517 U.S. 370, 373 (1996) (explaining that "[t]he claim defines the scope of a patent grant" (quotation omitted)); Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." (quotation omitted)); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves . . . to define the scope of the patented invention."); Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."), aff'd, 517 U.S. 370 (1996).[2] The '497 patent has one independent

---

[1] A process can be "a particular method or system of doing something, producing something, or accomplishing a specific result," or "a particular method or system used in a manufacturing operation or other technical operation." Webster's Third New International Dictionary 1808 (1993).

[2] To the extent Polyzen relies on the assignment to itself in paragraph 2.b of Polyzen Technology, including "patents [and] patent applications," as encompassing the '497 patent, the court rejects the argument. The assignment to Polyzen of patents and patent applications is limited to those that "relat[e] to production of various components and/or finished devices . . . ." 2008 DCA

claim and four dependent claims. See '497 Patent 10. Each claim begins with a preamble of a "medical balloon device." Id. Claim one, the independent claim, describes the balloon device as comprising three thermoplastic film layers with specific joined edges and an opening in the bottom layer that permits fluid communication between the bottom and top layers. Id.[3] Claim two, a dependent claim, includes the further limitation "wherein the second and third layers are secured intermediate said second and third edges so that the distal portion of the third layer bulges upwardly upon inflation." Id. The remaining dependent claims contain additional, qualitatively-similar limitations. See id.

The claims are directed to the specific design of the medical balloon device and, therefore, fall within the definition of RadiaDyne Product. Claim one, for example, describes the

---

¶ 2.b (emphasis added). Paragraph 2.e assigns the specific design of the rectal balloon catheter to RadiaDyne. Thus, the court interprets paragraph 2.b as covering patents and patent applications concerning production processes. See Bolton Corp. v. T.A. Loving Co., 317 N.C. 623, 628, 347 S.E.2d 369, 372 (1986) ("All parts of a contract are to be given effect if possible. It is presumed that each part of the contract means something.").

[3] Specifically, claim one states:

A medical balloon device, comprising:
a first thermoplastic film layer comprising a first material, wherein the first layer includes a first edge;
a second thermoplastic film layer comprising a second material, wherein the second layer includes a second edge joined to the first edge to form a bottom inflatable compartment between the first and second layer;
a third thermoplastic film layer including proximal and distal portions and comprising a third material different from the first and second materials wherein the third layer includes a third edge joined to the second edge to form a top inflatable compartment between the second and third layer; and
an opening in said bottom inflatable compartment to receive a lumen, wherein the bottom inflatable compartment is in fluid communication with the top inflatable compartment.

'497 Patent 10.

"specifications as to structure . . . positions, materials" for "building, or fabricat[ing]" the medical balloon. Cf. Webster's Third New International Dictionary 611–12 (1993) (definition of "design"). The claim is not directed to the process for fabricating the balloons, such as how the materials constituting the three layers are to be constructed, cut, or joined together. Rather, claim one explains the design for integrating the necessary constituent part, such as the fact that they are joined together on specific edges to form inflatable compartments. Thus, the '497 patent is a product patent, not a process patent. Cf. 35 U.S.C. §§ 101, 100(b) (defining "process" as "process, art, or method"); see Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 254 (1928) (acknowledging that product patents are different from process patents and that "[t]he former, if sufficiently described, may exist and be sustained independently of the latter"). Although some summary language in the patent states that the patent is "a method of fabrication," see '497 Patent 2, 9, the actual claims of the patent show otherwise. See Markman, 52 F.3d at 980 (the patent claims, not the specification, define the scope of the patent). Moreover, to the extent, if any, that one or more of the claims implicate Polyzen's Balloon Process Technology, the 2008 DCA incorporates the Balloon Process Technology into the specific design of the rectal balloon catheter. Accordingly, the plain language of the 2008 DCA instructs that the '497 patent, as RadiaDyne product, "will remain the propert[y] of RadiaDyne." 2008 DCA ¶ 6.a; Atl. Marine Corps Cmtys, LLC v. Onslow Cnty., N.C., 497 F. Supp. 2d 743, 756–57 (E.D.N.C. 2007) (equating "shall remain the property of" with ownership).

Polyzen makes several arguments in opposition to this conclusion. First, and in response to RadiaDyne's theory of breach, Polyzen argues that the filing a patent did not breach the 2008 DCA. See Pl.'s Resp. in Opp'n Def.'s Mot. Partial Summ. J. Breach of Contract [D.E. 121] 6–7. As discussed, Polyzen is correct. The mere act of filing a patent did not breach the 2008 DCA. Rather, it was Polyzen's act of assigning to itself, via its employees, the rights to the '497 patent that

10

breached the 2008 DCA.

Second, Polyzen contends that RadiaDyne's property interest in the '497 patent, whatever it may be, is not an ownership interest. See Pl.'s Resp. in Opp'n Def.'s Mot. Partial Summ. J. Breach of Contract 7–10. Polyzen's argument, however, rests on the faulty premise, drawn from paragraph 6.d of the 2008 DCA, that RadiaDyne's rights to the RadiaDyne Product are an exclusive license and not outright ownership. See id. 8–9; 2008 DCA ¶ 6.d.

Paragraph 6.d. cannot bear the weight that Polyzen assigns to it. Paragraph 6.d defines a process by which RadiaDyne may receive a nonexclusive license to Polyzen's intellectual property (specifically, the Device Process Technology and the Balloon Process Technology) in order to use that intellectual property to produce the RadiaDyne Product through a different manufacturer. See 2008 DCA ¶ 6.d (stating that if "RadiaDyne decides to use another manufacturer for RadiaDyne product, using Polyzen's IP, Polyzen agrees to grant non-exclusive license to make and have made to RadiaDyne" Polyzen's specified intellectual property (emphasis added)). Paragraph 6.d does not limit RadiaDyne's ownership interest of the RadiaDyne Product, which, as discussed, includes the '497 patent. Rather, paragraph 6.d permits RadiaDyne to gain a nonexclusive license to Polyzen's intellectual property if RadiaDyne wanted a third-party manufacturer to use that intellectual property because of Polyzen's inability or unwillingness to meet RadiaDyne's commercial needs. Furthermore, paragraph 6.d applies only if Polyzen and RadiaDyne "enter[] into a manufacturing and supply agreement, and . . . Polyzen is unable or unwilling to supply RadiaDyne its volume requirements at a reasonable transfer price . . . ." Id. The record shows that Polyzen and RadiaDyne did not enter into a manufacturing and supply agreement, thus obviating the application of paragraph 6.d. See Tilak Shah 30(b)(6) Dep. 42–44.

Third, Polyzen asserts that the '497 patent is Polyzen's intellectual property. See Pl.'s Resp.

11

in Opp'n Def.'s Mot. Partial Summ. J. Breach of Contract 1. As discussed, however, the '497 patent falls under the definition of the RadiaDyne Product that the 2008 DCA assigns to RadiaDyne. Thus, this argument fails.

Fourth, Polyzen asserts that the RadiaDyne Product assigned to RadiaDyne only covers a single balloon shape. See, e.g., Pl.'s Resp. in Opp'n Def.'s Mot. Partial Summ. J. Breach of Contract 2, 4, 6, 8. This assertion finds no support in the 2008 DCA. The definition of RadiaDyne Product, which Polyzen drafted, is the "specific design of [the] rectal balloon catheter . . . ." 2008 DCA ¶ 2.e (original emphasis omitted and emphasis added). As the definition of "design" makes clear, design means more than a single balloon shape. The only reference to "shape" in the 2008 DCA arises in the definition of Balloon Process Technology, which is assigned to Polyzen. 2008 DCA ¶¶ 2.d, 6.a (defining this technology as "Polyzen's PU film welded balloon technology . . . designed to articulate desired shape and profile of balloons for various applications.").

Finally, Polyzen mentions, without argument, a lack of specified damages. See Pl.'s Resp. in Opp'n Def.'s Mot. Partial Summ. J. Breach of Contract 11. A party may prevail on breach of contract and recover nominal damages only. See, e.g., United States v. D'Elegance Mgmt. Ltd., 217 F.3d 843, 2000 WL 966034, at *5 (4th Cir. 2000) (per curiam) (unpublished table opinion); Robbins v. C.W. Myers Trading Post, Inc., 251 N.C. 663, 666, 111 S.E.2d 884, 886 (1960); Turner v. Ellis, 179 N.C. App. 357, 363, 633 S.E.2d 883, 887–88 (2006). Thus, this argument fails.

In sum, the court grants RadiaDyne's motion for summary judgment on its breach of contract claim. RadiaDyne requests as remedy the transfer of Polyzen's interest in the '497 patent and related patents to RadiaDyne, as the 2008 DCA contemplates. See Complaint at 11, RadiaDyne, LLC v. Polyzen, Inc., No. 5:12-CV-102-D (E.D.N.C. Dec. 23, 2011), [D.E. 1]; Def.'s Mem. Supp. Mot. Partial Summ. J. Breach of Contract 11–12. Under North Carolina law, "[s]pecific performance is

12

available to a party only if that party has alleged and proven that he has performed his obligations under the contract and that his remedy at law is inadequate." Cavenaugh v. Cavenaugh, 317 N.C. 652, 656–57, 347 S.E.2d 19, 22 (1986); Whalehead Props. v. Coastland Corp., 299 N.C. 270, 282, 261 S.E.2d 899, 907 (1980). At present, RadiaDyne has not proven that a remedy at law is inadequate. The parties shall brief the court on whether there is an adequate remedy at law for Polyzen's breach of the 2008 DCA. The parties shall file their briefs no later than March 6, 2015. Responses are due March 16, 2015. There shall be no replies.

B.

The court next addresses RadiaDyne's motion for partial summary judgment on Polyzen's trade secret misappropriation claim. To establish a prima facie case of misappropriation, Polyzen must show that RadiaDyne (1) knew or should have known of the trade secret; and (2) had a specific opportunity to acquire it for disclosure or use, or has acquired, disclosed, or used it without the express or implied consent or authority of the owner. N.C. Gen. Stat. § 66-155; GE Betz, Inc. v. Conrad, 752 S.E.2d 634, 649 (N.C. Ct. App. 2013).[4] A plaintiff must allege a trade secret "with sufficient particularity . . . to enable a defendant to delineate that which he is accused of misappropriating and to allow a court to decide whether misappropriation has occurred." GE Betz, 752 S.E.2d at 649 (quotation omitted). "Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to rebut a presumption that the trade secrets were misappropriated." Id.

Viewing the evidence in the light most favorable to Polyzen, RadiaDyne disclosed to

---

[4] The Supreme Court of North Carolina has not interpreted sections 66-152 or 66-155. In construing North Carolina law, the court must, absent "definitive authority from North Carolina's highest court, attempt to divine what that court would do were it faced with this [claim]." Teague v. Bakker, 35 F.3d 978, 991 (4th Cir. 1994). In doing so, the court may consider cases from the North Carolina Court of Appeals, treatises, and the practices of other states. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005).

13

Dielectrics, a third-party manufacturer, four documents that each contain information about the medical balloon. See [D.E. 109-17] DIE 117–19 (email from Isham to Dielectrics with an attached Polyzen document); [D.E. 109-19] DIE 276–77 (two Polyzen documents); Def.'s Mem. Supp. Mot. Partial Summ. J. Trade Secret [D.E. 109] 7–8 (admitting that Isham sent DIE 276–77 to Dielectrics); [D.E. 109-20] DIE 278–79 (email from Isham to Dielectrics with an attached Polyzen document); Pl.'s Resp. in Opp'n Def.'s Mot. Partial Summ. J. Trade Secret [D.E. 122] 4–5 (alleging that Isham disclosed these four documents to Dielectrics). Three of these documents, however, are RadiaDyne Product. The drawings detailed on DIE 119, DIE 276, and DIE 277 all concern the specific design of the rectal balloon catheter. For example, DIE 119, which Polyzen claims is a trade secret, is titled "RB100 Balloon Device Assembly" and shows the design, including measurements, of the medical balloon and its associated catheter tubing. See [D.E. 109-17] DIE 119. The document also lists "Device Requirements," which describe the design of the medical balloon and associated catheter parts. See id. Moreover, DIE 276 and DIE 277 show similar information. The 2008 DCA makes RadiaDyne the owner of these three documents because they depict only the "specific design of [the] rectal balloon catheter." 2008 DCA ¶¶ 2.e, 6.a. As the owner, RadiaDyne could not misappropriate these documents. See N.C. Gen. Stat. § 66-152(1); GE Betz, 752 S.E.2d at 649–50 (noting that misappropriation requires disclosure "without the express or implied consent or authority of the owner."). Thus, the court grants summary judgment to RadiaDyne on Polyzen's misappropriation claim concerning the disclosure of DIE 119, DIE 276, and DIE 277.

As for DIE 279, Isham sent DIE 279 to Dielectrics on September 10, 2009. See [D.E. 109-20] 2–3. Although DIE 279 shows, in part, design specifications for the "RB100 Flat Balloon" that fall within the definition of RadiaDyne Product, it also contains specifications in Note 1 that define the depth of the three layers and, crucially, the apparent materials for each layer. [D.E. 109-20] DIE

14

279; see Tilak Shah Dep. 307 (stating that "it's a trade secret to show how we can make a balloon by not using three different material[s]. We can change the same modulus of elasticity by changing different thickness, we can create the balloon."). The 2008 DCA defines Device Process Technology, which it assigns to Polyzen, in part as "material specifications . . . to manufacture specific product for RadiaDyne." 2008 DCA ¶ 2.c. Viewing the record in the light most favorable to Polyzen, there is a genuine issue of material fact concerning whether RadiaDyne owned all of the information on DIE 279.[5]

In response, RadiaDyne contends that, assuming RadiaDyne did not own the documents it sent to Dielectrics, DIE 279 does not constitute a trade secret because there is no evidence that it has any commercial value. See Def.'s Mem. Supp. Mot. Partial Summ. J. Trade Secret 22–23; Tilak Shah Dep. 307 (acknowledging that Polyzen knows of no financial harm to itself from RadiaDyne's disclosure of DIE 279). Under North Carolina law, a trade secret

> means business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3). That a document is stamped "confidential" does not make it a trade

---

[5] RadiaDyne also cites invoices and purchase orders that reference the design of the rectal balloon catheter as proof of ownership. See Def.'s Mem. Supp. Mot. Partial Summ. J. Trade Secret 19–20. The 2008 DCA, however, is an integrated agreement that expressly "supersedes all prior or contemporaneous understandings or agreements . . . between the parties with respect to such subject matter." 2008 DCA ¶ 8.f. Thus, the 2008 DCA's provisions control the assignment of intellectual property.

15

secret. See, e.g., Glaxo Inc. v. Novopharm Ltd., 931 F. Supp. 1280, 1302 n.23 (E.D.N.C. 1996).

In determining whether the specifications listed under Note 1 on DIE 279 are a trade secret under North Carolina law, the court considers six factors:

> (1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

Byrd's Lawn & Landscaping, Inc. v. Smith, 142 N.C. App. 371, 375, 542 S.E.2d 689, 692 (2001); see State ex rel. Utils. Comm'n v. MCI Telecomms. Corp., 132 N.C. App. 625, 634, 514 S.E.2d 276, 282 (1999); Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc., 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997). The court preliminarily notes that, within the statutory scheme, the first three factors generally relate to the second prong of the definition of a trade secret, see N.C. Gen. Stat. § 66-152(3)(b), and the last three factors generally relate to the first prong. See N.C. Gen. Stat. § 66-152(3)(a). A party seeking to establish a trade secret must meet both prongs. See N.C. Gen. Stat. § 66-152(3).

As for the first two factors, the evidence is unclear to what extent people inside and outside Polyzen knew about the use of the same material to create the three-layer balloon design. As for the third factor, the extent of measures taken to guard secrecy, Polyzen and RadiaDyne signed the 2008 DCA that assigned intellectual property rights and also had signed an earlier confidentiality agreement. See 2008 DCA ¶ 3.c; Tilak Shah 30(b)(6) Dep. 228, 249. There is a genuine issue of material fact as to whether Note 1 was the subject of efforts to maintain its secrecy.

As for the fourth factor, Polyzen has presented no competent evidence on the value of Note 1 to itself and its competitors. Polyzen argues that DIE 279 has value because it "represent[s] the

16

culmination of an iterative process taking months of work to come up with a particular method of fabricating medical balloons that will take any number of desired shapes." Pl.'s Resp. in Opp'n Def.'s Mot. Partial Summ. J. Trade Secret 11. Polyzen, however, cites no evidence to support this assertion and attorney arguments are not evidence. See Fed. R. Civ. P. 56(c)(1), (2); IA Labs CA, LLC v. Nintendo Co., 863 F. Supp. 2d 430, 454 (D. Md. 2012); Wootton Enters., Inc. v. Subaru of Am., Inc., 134 F. Supp. 2d 698, 711 (D. Md. 2001). The only potentially relevant evidence the parties have cited is Tilak Shah's testimony that "Dielectrics may use [DIE 279] someplace else to their benefit and RadiaDyne's benefit." Tilak Shah Dep. 307. This conclusory testimony, which does not address the value of Note 1, is insufficient to cause this factor to weigh in favor of a trade secret.

As for the fifth factor, Polyzen initially quoted to RadiaDyne a total design cost of $4,500 and production cost of $19,000 to produce the balloon. See [D.E. 109-3] 4. Polyzen's quote for Phase II and Phase III did not itemize any costs for the design of the balloon but it totaled $46,800. See [D.E. 109-9] 5–7. Viewing the evidence in the light most favorable to Polyzen, a jury could find that Polyzen exerted sufficient effort or spent sufficient money to develop the information contained in Note 1 to create commercial value from the information not being generally known.

As for the sixth factor, Polyzen has not shown evidence on the ease or difficulty with which others could acquire or duplicate the information that the medical balloon could be constructed with three layers of the same material.

Viewing all six factors in the light most favorable to Polyzen, there is a genuine issue of material fact as to whether Note 1 constituted a trade secret, and summary judgment is inappropriate concerning Isham's disclosure of DIE 279 to Dielectrics. Accordingly, the court grants in part and denies in part RadiaDyne's motion for partial summary judgment on Polyzen's trade secret

17

misappropriation claim.

III.

In sum, the court GRANTS RadiaDyne's motion for partial summary judgment on its breach of contract claim [D.E. 112]. The parties shall submit briefs on the question of specific performance for Polyzen's breach of contract no later than March 6, 2015. Any responses are due March 16, 2015. There shall be no replies. Furthermore, the court GRANTS IN PART and DENIES IN PART RadiaDyne's motion for partial summary judgment on Polyzen's trade secret misappropriation claim [D.E. 108]. Polyzen's claim for misappropriation of trade secrets with respect to the information contained in Note 1 of DIE 279 survives. Finally, after the submission of the briefs, the parties shall engage in a court-hosted settlement conference with United States Magistrate Judge James E. Gates.

SO ORDERED. This 18 day of February 2015.

JAMES C. DEVER III
Chief United States District Judge